INCORPORATED VILLAGE OF NORTH HORNELL, Plaintiff, *v.* EDWIN N. RAUBER et al., Defendants.

Supreme Court, Steuben County, April 10, 1943.

*C. Everett Shults* for plaintiff.

*John W. Hollis* for Edwin N. Rauber, defendant.

VAN VOORHIS, J. The action is to terminate a sawmill built and operated by defendant Edwin N. Rauber upon leased land, in the village of North Hornell, Steuben County, New York. Defendants Wells, owners of the land, have consented to the granting of the relief prayed for in the complaint. Rauber, who has answered and contests the action, is in rightful occupation, according to the complaint, which states that he is the lessee in possession of the land and the owner of the buildings, machinery, tools and equipment now located thereon. The mill is near the edge of the village and adjoins land owned by New York State for flood abutment dikes. It was built in July, 1935, after Rauber's previous mill located elsewhere had been inundated by a flood.

The complaint contains three causes of action. The first pleads a zoning ordinance adopted in 1936 restricting the area in question and a considerable portion of the village of North Hornell to residential purposes. Having been constructed before this ordinance was adopted, Rauber's sawmill could have been continued as a nonconforming use under the terms of the ordinance except for a fire in December, 1941. It is contended that more than 75% of the assessed valuation was destroyed by this fire so as to prevent reconstruction (Zoning Ordinance, § 7). The second cause of action alleges that part of the sawmill encroaches upon the limits of a public street and should therefore be removed, while the third cause of action sets forth that its operation should be enjoined as a nuisance.

The second and third causes of action will be decided before considering the effect of the zoning ordinance.

It appears from the map (Plaintiff's Ex. 1) that no portion of the sawmill or the smaller building designed as " plane mill " encroaches upon Cleveland Avenue. The zoning ordinance provides for setback lines but these apply only to structures thereafter erected. They can have no application to Rauber's buildings as originally constructed. Lumber and ties have been piled within the limits of Cleveland Avenue which should be removed.

The sawmill does not constitute a nuisance. It is true that the Village of North Hornell, adjoining the City of Hornell, is largely a place of residence for people working in the city. The presence of any industrial establishment adversely affects the value of neighboring property.* Doubtless some smoke and noise come from this mill. No nuisance is established, even if some damage, annoyance and injury has resulted to others, unless the use of the premises is unreasonable. (*McCarty* v. *Natural Carbonic Gas Co.*, 189 N. Y. 40, 46, 47.) Many residents of North Hornell have testified as witnesses for the Village, but a large number of them conceded on cross-examination that less smoke from the sawmill is present even in its immediate vicinity than exists generally throughout the city of Hornell. Some testified that as much dirt and noise come from the highway as from the mill, others that the nearby Bethesda

* It has been assumed that neighboring lots are worth somewhat less than they would be if the mill were not there; evidence to that effect is in the record. This evidence was regarded as ineffective upon the nuisance cause of action, since the witness testified that the same depreciation would occur if the mill were any industrial plant similar to this but operated without smoke or noise. Depreciation of neighboring property due to the mere presence of a factory which would not exist if the area were entirely residential does not tend to establish a nuisance.

Hospital creates as much smoke. Two locomotive engineers, who testified for plaintiff, stated that the quantity of smoke is but a fraction of that from a railroad locomotive. One of these men stated that a locomotive emits twenty times as much smoke as the mill. The burning of sawdust and other waste wood creates a kind of soot which has disadvantages differing from those of coal, but this is not enough in a mill of this size to annoy, injure or endanger the comfort, repose, health or safety of other residents of the village, in a legal sense, or to render them insecure in the use of property. There is no evidence of faulty operation, nor that noise or sparks are given off in quantity sufficient to constitute a nuisance. Whether the mill is a nuisance is not to be determined by the number of objectors, nor the lawsuit decided by balancing the advantages and disadvantages to the parties, unless defendants' use of the premises is unreasonable. It cannot be held to be unreasonable if the smoke condition is better than exists everywhere in the adjoining City of Hornell. A sawmill is not a nuisance *per se*. This was recognized by the Village Board in 1939, when it granted Rauber permission to make alterations which would not have been done if the Board had then considered it to be a nuisance.

The case of *McCarthy* v. *Santa Clara Lumber Co.* (241 N. Y. 565), cited by plaintiff, involved a different type of mill, employing 100 men at the plant, and having a total pay roll of $250,000 per year. The unreported opinion of the trial court, whose judgment was affirmed without opinion on appeal (Record on Appeal, fols. 1338, 1339) states: '' The former owners had used it only as a sawmill and, while it was so used, there was little or no complaint.'' Defendant therein afterward built a rossing mill and one for the manufacture of sulphite chips. The opinion continues: '' Before that, sawdust had been the fuel and, while a fine soot was emitted, the conditions were not such as to cause complaint.'' Rauber's mill is much smaller, measuring sixty-five feet by twenty-four feet, operated by himself and a few helpers.

That brings us to the more difficult question whether the mill should be enjoined under the zoning ordinance on account of the fire which occurred in December, 1941. No point has been raised of any voluntary abandonment of the existing use by Rauber. He repaired his mill as soon as practicable after the fire in view of his limited assistance and the difficulties placed in his way by the Village authorities. The pertinent part of the zoning ordinance reads as follows:

" Section 7 — Reversion of Use. If a non-conforming build-ing or use, existing at the time this ordinance shall become effective, is subsequently changed to a conforming use, or is destroyed by fire, explosion, Act of God, or the public enemy to the extent of more than seventy-five per cent of its assessed valuation, such building or use shall not again be altered or rebuilt, except in conformity with the rules and regulations of the district in which such building is located."

The 1941 assessment roll contains the following entry: " Wells, J. B. and wife sawmill on leased land $300.00." The damage by fire was $350. The true value before the fire of the building and fixtures belonging to the realty was $1,500. It was destroyed to the extent of more than 75% of the $300 appearing upon the roll as the assessed valuation, but less than 25% of the true value of the structure. Does this render the application of the zoning ordinance to the Rauber sawmill unreasonable, arbitrary and confiscatory? That is the question which the court is called upon to decide. (*Fire Department of New York* v. *Gilmour*, 149 N. Y. 453, 458, 459; *People* v. *Kaye*, 212 N. Y. 407, 417.)

To enforce this provision of the zoning ordinance against the defendant Rauber in the manner contended for by plaintiff would be oppressive. The mill was built before the adoption of the ordinance. Even after its enactment, he was permitted by the Village Board to make alterations in 1939. The members of the Board met at the mill in person and orally permitted the changes which Rauber requested and afterward made at substantial cost. Rauber had a vested property right, which the Village Board recognized, to maintain and operate his sawmill as a pre-existing use which could not be destroyed by any subsequent zoning ordinance. (*People ex rel. Orten-berg* v. *Bales*, 224 App. Div. 87, affd. 250 N. Y. 598; *Village of Mill Neck* v. *Nolan*, 233 App. Div. 248, affd. 259 N. Y. 596; *City of Buffalo* v. *Chadeayne*, 134 N. Y. 163; *People* v. *Miano*, 234 App. Div. 94; *Dobbin* v. *Los Angeles*, 195 U. S. 223; *Matter of Pelham View Apts.* v. *Switzer*, 130 Misc. 545; *People* v. *Stanton*, 125 Misc. 215; Rathkopf on Zoning & Planning, § 21.) Did the fire terminate this vested right? Would an injunction deprive Rauber of property without due process of law? However much was destroyed in the fire, a substantial amount in value remained. The wooden floor, walls and roof of the building were burned, but the principal part of the sawmill consisted in the concrete foundation, which was mostly left intact, and the machinery, which suffered no injury to the metal parts. The boilers did

not even require to be remounted because they rested upon concrete supports especially constructed for the purpose. The engine, saws and planer, which had been bolted to the wooden floor, had to be set up again. The floor itself, as has been stated, was supported by concrete piers, forty-eight in number, only five or six of which were injured by the fire. The foundation and machinery, not the shelter thrown around them, form the nucleus of the mill. In arriving at the value of the real property before the fire, sawmill machinery must be included. (*Bigler* v. *National Bank of Newburgh*, 26 Hun 520, 523, affd. without opinion 97 N. Y. 630; *Voorhees* v. *McGinnis*, 48 N. Y. 278; *New York Security Co.* v. *Saratoga Gas Co.*, 88 Hun 569, 591; *People ex rel. Nat. Starch Co.* v. *Waldron*, 26 App. Div. 527.) The court stated in *Bigler* v. *National Bank of Newburgh* (*supra*): " Besides this our view is that the engine and its connections, and all the other machines and property in question, were fixtures to the freehold and passed to the defendant by the purchase at the foreclosure sale. The machines were either actually annexed to the realty or to something appurtenant thereto, or were adapted to the use for which the building was constructed and to which it was appropriated; and as the plaintiff placed all this machinery in the places now occupied by it when he owned the building, and had no view except to continue its use therein, *it must be assumed that his intention in making the annexation was to make a permanent accession to the freehold for the purpose of continuing the work usually done in a steam sawing and planing mill.* The question here is the same as between vendor and vendee, and the purpose and intent of the annexation are most important considerations. (*McRea* v. *Cent. Nat. Bank*, 66 N. Y. 489)." (Italics supplied.) The same was held with regard to a " temporary " grist mill in *Potter* v. *Cromwell* (40 N. Y. 287). This accords with the modern trend of holding fixtures to be part of the real estate where they are installed to make a building fulfill its purpose (*Gould* v. *Springer*, 206 N. Y. 641, 646; *Dolan* v. *Doherty*, 242 App. Div. 671; *Matter of Liddle Cut Stone Co.*, 242 F. 691; 1932 Report, N. Y. State Bar Assn., Address by CARDOZO, Ch. J., p. 295). They must be taken into account along with the rest of the building in determining the percentage of loss by fire which has been sustained.

If plaintiff's position were sound, the undamaged portion of this sawmill would be confiscated. It is no answer to say that some of the unburned part could be salvaged and reconstructed elsewhere. That would not be true, in any event, of the forty-two or forty-three uninjured concrete piers supporting

the structure, nor the special cement foundation beneath the boilers. Even assuming that some of the machinery which became part of the realty could have been transported and utilized in some other mill, that could only have been done at appreciable expense unnecessary to the restoration of the mill in its present location. As said in *Bigler* v. *National Bank of Newburgh* (26 Hun 520, *supra*) of similar machinery, it must be regarded as " a permanent accession to the freehold ". Plaintiff's counsel argues that the zoning ordinance specifies 75% of the *assessed valuation,* and that if more than that is destroyed the question is settled automatically in plaintiff's favor. Also, *Matter of Koeber* v. *Bedell* (280 N. Y. 692) is cited, holding, in a memorandum decision, that a celluloid factory which had been destroyed by fire to the extent of more than 75% of its actual value could not be reconstructed where a similar ordinance was involved. It has not been seriously disputed that depriving this defendant of the use of the undamaged residue of his structure amounts to taking away property without compensation. Rather is it argued that what used to be called confiscation is justifiable in an enlightened age, if enough people desire it and the amount to be taken away from the owner is not too great. That, in effect, is what the Court of Appeals is said to have held in *Matter of Koeber* v. *Bedell (supra).* Assuming (for the moment) that this is a correct statement of the law, and that confiscation is wholly a matter of degree, it would not control the decision in this action on account of the difference in degree which exists, viz., the greater proportion of the true value of Rauber's sawmill which survived the fire and would be taken away if the plaintiff were to have an injunction. The court is unable to agree with the contention that this is of no consequence for the reason that the ordinance mentions only assessed valuation. The reasonableness of that provision is under determination. In truth not 75% but 23% in value was destroyed by the fire. Seventy-seven per cent of the value of the building remained; that is the proportion which the village would prevent this defendant from utilizing and thereby confiscate, less whatever could be recouped as salvage. Three hundred dollars was an inadequate assessed valuation; at least, it was far below the true value. The assessed valuation of real estate is some evidence of fair market value. (*Matter of Simmons* [*Ashokan Reservoir*], 132 App. Div. 574, 576; *Adler* v. *Berkowitz,* 229 App. Div. 245, 249, modified on other grounds 254 N. Y. 433; *Heiman* v. *Bishop,* 272 N. Y. 83, 88; *President*

*& Directors of Manhattan Co.* v. *Williams*, 152 Misc. 901, 902.) It is to be taken into consideration along with other factors (*Heiman* v. *Bishop, supra*), but is not conclusive, and is not made conclusive by the reference to assessed valuation in the zoning ordinance. The court need not decide here whether this provision (§ 7) would ever be valid, or whether in some instances the assessed valuation might be a sufficiently accurate index of the real value so as to give effect to it if the section is not otherwise confiscatory. Certainly the reasonableness of the ordinance in a particular case must be decided on the basis of the real facts. The court cannot be estopped by anything contained in it from deciding whether its operation is confiscatory. The reference to assessed valuation in section 7 does not render less oppressive a deprivation of property without due process of law where the assessed valuation is beneath the true value. The remedy for an inadequate assessed valuation is to raise it, not to put the taxpayer out of business by an injunction.

This has been said upon the assumption that plaintiff is correct in its interpretation of *Matter of Koeber* v. *Bedell* (280 N. Y. 692, *supra*). It is seriously questioned that the Court of Appeals rested its decision upon that ground, or intended without an opinion, to announce a general rule that 25% of the investment of an owner might be expropriated. In the record and briefs on appeal emphasis was laid upon the inflammable nature of celluloid manufacturing involving danger from fire to surrounding property, which may have affected the decision. An exercise of the police power to destroy existing buildings when the public safety or the public health is in imminent danger is different from the zoning of land and buildings for trade, industry, residence and other purposes to promote the orderly development of municipalities. No compensation to the owner is required in the former instance (*Tenement House Dept.* v. *Moeschen*, 179 N. Y. 325, 330; *Russell* v. *City of New York*, 2 Den. 461), but in the latter buildings and structures rightfully erected cannot be demolished or their use enjoined except upon payment of compensation. (See decisions cited, *supra*, holding Rauber to have a vested right as against the public to maintain the mill.) It is found that this sawmill is not a menace to the public safety or to the public health on account of escaping sparks, smoke, noise, or other cause. Possibly no constitutional rights would be invaded by preventing reconstruction of nonconforming buildings where destruction has been complete. The following statement, by a leading authority, throws light upon the practice in these matters: " The

New York City building zone resolution has always allowed nonconforming buildings, if destroyed, to be rebuilt, but most ordinances allow rebuilding only when the destruction is partial." (Bassett on Zoning [1940 ed.] p. 111.) Nevertheless, the terms of this ordinance forbid rebuilding where the destruction is partial. That the interpretation of *Matter of Koeber* v. *Bedell* (*supra*) contended for by plaintiff is erroneous is indicated by the following quotation from *Matter of 440 E. 102nd St. Corp.* v. *Murdock* (285 N. Y. 298, 310): "There could be no abandonment by the owner of the old non-conforming uses through the taking of a part of the premises by the city and the demolition of the buildings thereon *or by the injury to and subsequent demolition of another building on account of fire*. Neither occurred through the voluntary act of the owner." (Italics supplied.) Zoning is firmly established in our law (*Village of Euclid* v. *Ambler Realty Co.*, 272 U. S. 365; *Lincoln Trust Co.* v. *Williams Bldg. Corp.*, 229 N. Y. 313), and extensions of existing doctrines are still in progress. (*Marcus* v. *Village of Mamaroneck*, 283 N. Y. 325; *Baddour* v. *City of Long Beach*, 279 N. Y. 167, especially page 172 concerning aesthetic considerations.) Even so, it contemplates the future development of cities, towns and villages, and has not arrived at the point of attempting to make over the past. Modern statutes for slum clearance projects provide compensation to the owner where it is deemed necessary to appropriate real estate to a public use in order to change the development of a city which has already taken place (Public Housing Law, art. VII, " Acquisition of Property ", enacted 1939). Such projects might be termed planning retrospectively, which is what the plaintiff aims to do in this action, but with the difference that plaintiff does not propose to pay for what it takes. Such cases are outside of the field of zoning, which does not embrace the power of eminent domain with the accompanying authority to compensate for private property taken for a public use.

Until recently, there would not have been much basis for dispute. Modern trends of constitutional interpretation do not appear to have changed the result. Zoning is within the field of social legislation, but is outside of the storm center of controversy over constitutionality of the more widely discussed social reform measures of the day. Epochal decisions by courts of high authority upon the latter subjects have sometimes seemed to rock the whole structure of constitutional law, and doubtless have had repercussions extending into every part. Nevertheless it would be a poor service to the cause of social

reform, if, apart from the main points at issue, it were to be regarded as making the law of property weak, and exposing the individual without restraint to the dominance of majorities and powerful minorities. Democracy depends upon respect for the individual as well as upon majority rule. The multiplication of minority pressure groups goes hand in hand with the relaxation of constitutional safeguards protecting commonly accepted personal and property rights. When the law is weak, men tend to take it into their own hands. There is ample room for organization in American life, but people should not be obliged to organize to preserve rights the safeguarding of which is the proper function of law. The small manufacturer or merchant feels this acutely, since he finds it hard to succeed in wielding organized power for his own protection. Rauber, with a $1,500 sawmill, whose business is legal but unpopular, finds himself confronted by the organized civil power of the Village, set in motion by the complaints of his neighbors. He has and should have no protection but the law. It will not fail him.

Under subdivision (a) of section 5 of the zoning ordinance, a permit is required before the alteration of any structure is commenced. Defendant Rauber has violated that requirement by restoring the mill after the fire without a permit. This infraction is technical since an application for a permit would have been refused, as he was informed by the Village authorities. Lack of a permit would not justify an injunction requiring removal of the mill for the reasons stated by the Appellate Division in *Village of Mill Neck* v. *Nolan* (233 App. Div. 248, affd. 259 N. Y. 596, *supra*). Whether he may be liable to a penalty for not bringing against the Village a proceeding in the nature of mandamus to compel the issuance of a permit before rebuilding is not decided.

The complaint should be dismissed, except that to the extent that ties, lumber or other wood have been piled within the property lines of the streets, the judgment shall command their removal.